FILED
2025 MAR 10 AM 9:45
CLERK
U.S. DISTRICT COURT

CHRISTOPHER K. ANDERSEN
5024 W FROGS LEAP DR
UNIT 1203
SOUTH JORDAN, UT 84009
TELEPHONE (385) 560-9945
EMAIL: Christopher.k.andersen@gmail.com

Case: 2:25−cv−00178
Assigned To : Barlow, David
Assign. Date : 3/10/2025
Description: Andersen v. Olympus at Daybreak et al

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CHRISTOPHER K. ANDERSEN;<br>Plaintiff,<br><br>and<br><br>OLYMPUS AT DAYBREAK, JILLIAN PENMAN, and DOES 1-10,<br>Defendants. | **COMPLAINT FOR**:<br><br>1. Violations of the Fair Housing Act, 42 U.S.C. § 3601 et seq.<br>2. Violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.<br>3. Retaliation in Violation of the Fair Housing Act, 42 U.S.C. § 3617<br><br>**Contract Claims:**<br>4. Breach of Contract<br>5. Breach of the Implied Covenant of Good Faith and Fair Dealing<br><br>**Utah Torts:**<br>6. Abuse of Process<br>7. Failure to Train<br>8. Failure to Supervise<br>9. Defamation<br>10. Negligent Infliction of Emotional Distress<br>11. Intentional Infliction of Emotional Distress<br><br>**Utah Statutory Claim:**<br>12. Wrongful Eviction in Violation of Utah Code § 78B-6-802<br><br>**JURY TRIAL DEMANDED**<br><br>Case no.<br><br>Honorable |

## I. NATURE OF THE ACTION

1.      Plaintiff Christopher K. Andersen brings this civil action against Defendants Olympus at

Daybreak and Jillian Penman for their deliberate, retaliatory, and discriminatory actions in

violation of federal and state housing laws, contractual obligations, and fundamental

constitutional rights.

2.      Defendants engaged in a systematic pattern of misconduct, including unlawful eviction

practices, refusal to provide reasonable disability accommodations, retaliation for asserting

tenant rights, and misuse of legal procedures. Their actions violate the Fair Housing Act (42

U.S.C. § 3601 et seq.), the Americans with Disabilities Act (42 U.S.C. § 12131 et seq.), and due

process protections under the Fourteenth Amendment (42 U.S.C. § 1983).

3.      In addition to federal violations, Defendants breached their contractual and statutory

obligations under Utah law by:

A.      Wrongfully denying a medically supported Emotional Support Animal (ESA) request.

B.      Failing to maintain habitable living conditions, including prolonged refusal to repair a

defective water heater.

C.      Issuing an improper and retaliatory Three-Day Notice to Vacate instead of a legally

required Notice to Comply or Vacate, bypassing procedural protections under Utah landlord-

tenant law.

D.      Engaging in defamatory conduct by falsely implying Plaintiff and his spouse wrongfully

withheld another tenant's package, imputing criminal behavior without evidence.

E.      Ignoring required legal procedures by conditioning any reasonable accommodation on

Plaintiff's admission of a lease violation.

4.      Defendants' misconduct was intentional and calculated to pressure Plaintiff into vacating

his home rather than complying with their legal duties. Their retaliatory eviction, harassment, and refusal to engage in the legally required interactive process constitute willful and reckless disregard for Plaintiff's rights.

5.      As a direct result of Defendants' unlawful conduct, Plaintiff has suffered severe emotional distress, financial hardship, housing instability, and deprivation of his legal rights. Plaintiff seeks legal and equitable relief, including compensatory and punitive damages, injunctive relief preventing further discriminatory actions, and declaratory relief confirming Defendants' violations of federal and state laws.

6.      Defendants' conduct was not merely negligent or misguided but was a deliberate and calculated effort to punish Plaintiff for asserting his legal rights. Their actions reflect a reckless disregard for federal and state housing protections, demonstrating an intent to intimidate, coerce, and deprive Plaintiff of his rights under the law. Such unlawful conduct necessitates judicial intervention to prevent further harm and hold Defendants accountable for their blatant violations.

## II. PARTIES

7.      **Plaintiff:** Christopher K. Andersen is an individual residing at 5024 W Frogs Leap Dr, Unit 1203, South Jordan, Utah 84009.

8.      **Defendant Olympus at Daybreak:** Located at 4950 W Frogs Leap Dr, South Jordan, Utah 84009, Olympus at Daybreak is an apartment community offering one, two, and three-bedroom apartments with amenities such as a resort-style pool, fitness center, and business center. The property is managed by Olympus Property Management, a company responsible for overseeing residential leases and tenant relations at this location.

9.      **Defendant Jillian Penman:** Serving as a Regional Manager at Olympus Property, Jillian Penman oversees a multi-state property portfolio and has been recognized for her leadership and

property operations management skills. She has been directly involved in the management practices at Olympus at Daybreak, including the conduct alleged in this complaint.

10.     **Defendants Does 1-10:** These are individuals currently unknown to Plaintiff who participated in or were complicit with the alleged acts of retaliation, discrimination, and wrongful eviction. Plaintiff reserves the right to amend this complaint to include the names and capacities of these individuals once they are ascertained.

## III. JURISDICTION AND VENUE

11.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under federal statutes, including the Fair Housing Act (42 U.S.C. § 3601 et seq., specifically §§ 3604(f) and 3617), the Americans with Disabilities Act (42 U.S.C. § 12131 et seq.), and federal civil rights laws (42 U.S.C. §§ 1983, 1985).

12.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state-law claims, including Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, and Defamation, because these state-law claims form part of the same case or controversy and arise from the same common nucleus of operative facts as the federal claims.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), as Defendants reside in this judicial district and all substantial events or omissions giving rise to Plaintiff's claims occurred in South Jordan, Utah, within the jurisdiction of the United States District Court for the District of Utah. The property at issue, Defendants alleged wrongful acts, and all relevant transactions occurred within this judicial district, making venue appropriate under 28 U.S.C. § 1391(b).

## IV.FACTUAL BACKGROUND

14.     Plaintiffs moved into Olympus at Daybreak on or about September 21, 2024.

15.     Plaintiffs pay approximately $1,744.00 monthly in rent and has consistently paid rent on time without incident.

**ESA Denial:**

16.     On or about August 21st, 2024, Plaintiff's wife, Angela D. Andersen ("Angie"), submitted a formal request to Defendants for an Emotional Support Animal ("ESA"), specifically a cat, under the Fair Housing Act ("FHA"). The request was supported by a letter from her licensed mental health provider, Stephanie Kinney, LMFT, who has been a licensed marriage and family therapist in Utah since March 28, 2022 (License No. 12774490-3902).

17.     The medical letter, dated August 21, 2024, explicitly confirms that Angie has been diagnosed with Depressive Disorder and Generalized Anxiety Disorder, both recognized disabilities under the Diagnostic and Statistical Manual of Mental Disorders (DSM-5). The letter further details her symptoms, including anxiety, depressed mood, sleep disturbances, fatigue, restlessness, irritability, and difficulty completing daily activities. Kinney's letter states that an ESA, specifically her cat Loki, is necessary to mitigate these symptoms by providing comfort, reducing anxiety, and improving her ability to sleep.

18.     Despite this medically verified documentation, Defendants denied Angie's ESA request, asserting that because the letter was obtained online, it was invalid. This reasoning is legally baseless, as the Fair Housing Act and HUD guidelines do not allow landlords to reject ESA documentation solely because it was provided through telehealth or an online consultation. The licensed medical professional's credentials and knowledge of the patient—not the method of consultation—determine the validity of an ESA letter.

19.     Plaintiff immediately raised this unlawful denial with Defendants, explaining that the

letter met all FHA requirements, was written by a properly licensed provider, and included

detailed information about the disability and the necessity of the ESA. Defendants, however,

refused to reconsider and continued to wrongfully assert that the documentation was invalid,

violating the FHA's requirement to make reasonable accommodations for individuals with

disabilities.

20.      This blatant disregard for Defendants' legal obligations under federal law only worsened

over time. Their refusal to grant a reasonable accommodation for an emotional support animal

was just the beginning of a broader pattern of unlawful conduct that escalated into repeated

violations of the Fair Housing Act, Americans with Disabilities Act, and Utah landlord-tenant

laws. Defendants consistently ignored their legal responsibilities, retaliated against Plaintiff for

asserting his rights, failed to address habitability concerns, improperly escalated lease

enforcement actions, and ultimately sought to evict Plaintiff through a procedurally defective and

retaliatory notice. Their repeated and deliberate noncompliance demonstrates not just negligence,

but a willful effort to circumvent federal and state law and disregard the rights of tenants,

particularly those with disabilities.

**Failure to Repair Water Heater:**

21.      Shortly after moving into the premises, within the first month, Plaintiffs' water heater

ceased functioning entirely on three (3) separate occasions, necessitating repeated requests for

Defendant's assistance to restore its operation. Each time Plaintiff had to go without hot water

entirely while waiting for Defendant to come into their home (water heater is located inside the

home), invade their privacy and turn on the water heater.

22.      Between September 21, 2024, and January 31, 2025, Plaintiffs submitted at least seven or

eight written maintenance requests explicitly asking Defendant to permanently repair the

malfunctioning water heater. Defendant consistently failed to adequately address or permanently resolve the issue. Even when the water heater was working, it would run about 15 minutes of lukewarm water before requiring almost two hours to return back to warm water.

**Water Heater and a Notice of Legal Action**

23.     On January 31, 2025, after no less than 7 requests for Defendant to permanently fix the on-going defective water heater, Plaintiffs sent Defendant a written notice titled "FINAL LEGAL NOTICE –HABITABILITY VIOLATION AND DEMAND FOR IMMEDIATE REMEDY." notifying Defendant that if a permanent repair was not made promptly, Plaintiffs would initiate legal action.

**Water Heater and Constructive Eviction**

24.     On February 12, 2025, at 8:30 AM, instead of permanently repairing the defective water heater as required by Utah Code § 57-22-4(1)(b)(ii)**,** Defendant Jillian Penman responded in writing by encouraging Plaintiffs to vacate the premises rather than fulfilling their legal obligation to provide essential habitability services**.** This constitutes a constructive eviction[1], as it demonstrates a deliberate effort by Defendants to make living conditions untenable, thereby coercing Plaintiffs into leaving.

25.     On or about February 12, 2025, only after Plaintiffs informed Defendant of their intention to hire an independent third party to repair the water heater, Defendant finally engaged a third-party inspector to evaluate the water heater.

26.     On or about February 18, 2025, the third-party inspector confirmed the water heater was defective, and Defendant finally arranged for a permanent repair nearly seven months after

---

[1] Constructive eviction occurs when a landlord's failure to maintain essential services renders a rental unit uninhabitable and forces a tenant to vacate, even without a formal eviction action (*Wade v. Jobe*, 818 P.2d 1006, 1010 (Utah 1991)).

Plaintiffs initially reported the issue. But only because a third-party professional verified for them what Plaintiff, his wife and their minor children had been reporting all along.

**Hole in Wall – Baby Hamster:**

27.    On or about February 26, 2025, Plaintiffs submitted a written maintenance request after discovering a hole in the child's bathroom wall and cabinetry, through which a baby hamster, obtained by their child without parental knowledge or consent, became trapped. Plaintiffs requested immediate assistance from Defendant's maintenance team.

28.    Plaintiffs' maintenance request was ignored. Instead, on or about February 28, 2025, Defendant served Plaintiffs with a Notice to Comply or Vacate, alleging a contractual breach due to possessing an unauthorized baby hamster.

29.    Plaintiffs promptly responded on March 1, 2025, notifying Defendant that the unauthorized baby hamster had been removed from the premises.

30.    Defendants' issued Notice to Comply or Vacate over one (1) baby hamster, beyond being petty and patently absurd, was issued in direct retaliation for Plaintiffs' request to have the hole in the wall repaired. Rather than addressing the legitimate maintenance concern, Defendants instead weaponized the lease by issuing an eviction notice, demonstrating a clear intent to punish Plaintiffs for asserting their rights. This retaliatory action was further compounded by Plaintiffs' prior warning that Defendants would be held legally responsible should their pet suffer harm due to the hazardous condition—an issue Defendants willfully ignored.

**New Neighbors First Noise Complaint:**

31.    On or about February 23, 2025, Plaintiffs submitted a written noise complaint regarding excessive noise from new upstairs neighbors who had just moved in the night before. Advising management in writing that they were up until 4 AM banging around furniture, etc. with their

move in. Further, advising management that since they were new, they perhaps were not aware of the quiet hour provisions.

**Second Noise Complaint**

32.    On or about February 24, 2025, Plaintiff submitted in writing a second formal noise complaint regarding persistent and disruptive noise from the upstairs neighbors. Instead of implementing a meaningful or effective solution, Defendant responded with an approach that was both inadequate and illogical—sending an employee to Plaintiffs' apartment at a random, arbitrary time in an attempt to "catch the noise in the act." This method was not only impractical but also demonstrated a fundamental disregard for the nature of the complaint.

A.    The reported disturbances occurred late at night and or were sporadic, making it entirely unrealistic to expect that sending an employee for a short visit ten-minute visit during office hours would provide any meaningful assessment. This approach was akin to walking into a forest in the afternoon, declaring there are no owls, and using that as proof they don't hoot at night. Even more absurdly, when Plaintiffs suggested the use of a noise monitoring device—a simple and objective solution—Defendants outright refused.

B.    Rather than taking appropriate action to enforce lease provisions or implement meaningful corrective measures, Defendants' response was nothing more than a performative, hollow gesture designed to feign concern while ensuring no real resolution. This blatant indifference to Plaintiffs repeated, well-documented complaints not only exacerbated the ongoing problem but also contributed to the denial of a reasonable accommodation under the Fair Housing Act (FHA), 42 U.S.C. § 3604(f), as the excessive noise was interfering with Plaintiffs ESA that he was granted back in September of 2024 and disability accommodations.

**Third Noise Complaint – Interference with ESA Therapeutic Benefits**

33.    On March 2, 2025, Plaintiffs submitted a third written noise complaint, detailing ongoing disturbances during quiet hours that severely impacted the therapeutic benefit of his ESA cat. The loud, sudden pounding from the upstairs unit especially during quiet hours repeatedly woke up Plaintiff and startled the cat awake, causing it to jump up, flee, and hide from Plaintiffs side. As the cat sleeps with Plaintiff as a therapeutic tool to reduce anxiety and aid in falling asleep, these repeated disturbances negated its intended purpose, worsening Plaintiffs' sleep deprivation and anxiety symptoms.

34.    On March 3, 2025, Defendant Jillian Penman ("Penman") responded dismissively, attempting to discredit and deflect responsibility instead of addressing the problem. In response to Plaintiffs' third documented complaint, Defendant relied on three flawed arguments:

A.    The "Vacant Unit" Claim – Defendant falsely asserted that the first complaint was invalid because the unit above was vacant at the time.

B.    The 10-Minute Visit "Investigation" – Defendant cited a brief, random daytime inspection in which an employee did not hear noise, failing to account for the fact that the disturbances occurred late at night or at sporadic moments and rejecting Plaintiffs' offer to use a noise monitoring device as an objective solution.

C.    The Burden Shift – Defendant placed the burden entirely on Plaintiffs to contact security at the exact moment noise occurred, despite the impracticality of waking up in the dead of night (while Plaintiff had to work at 5 AM and was under the influence of prescribed sleep medications), calling security, and waiting for them to arrive while already struggling with sleep deprivation in hopes of them hearing the disruptive sounds right at the precise moment.

**Plaintiff Criticized Defendants Lack of Response**

35.    Later that day, Plaintiff directly refuted these arguments in a sharply critical response,

highlighting the logical absurdity of Defendants actions and positions regarding the on-going new noise disturbances.

**Retaliatory Eviction as a Weapon of Personal Vendetta: How Defendant's Ego and Embarrassment Led to an Unlawful Three-Day Notice**

36.     Only four days later, on March 7, 2025, in a clear act of retaliation, Defendant Jillian Penman—who had just days earlier been publicly embarrassed and criticized in Plaintiff's scathing email—issued a legally improper Three-Day Notice to Vacate. This abrupt escalation was not rooted in any legitimate lease violation but rather a personal vendetta, driven by her bruised ego and desire for retribution.

A.     Plaintiff's March 3, 2025, email had thoroughly dismantled Defendant's prior dismissive response, exposing her illogical reasoning, failure to investigate the noise complaints properly, and refusal to address his concern around how the noise was interfering with his ESA accommodation. Rather than addressing the issues in good faith, Defendant reacted emotionally, weaponizing the eviction process as a means to silence and punish Plaintiff.

B.     The retaliatory nature of this eviction is unmistakable. Even assuming arguendo that the alleged lease violation was valid, Utah Code § 78B-6-802 required a Notice to Comply or Vacate, not an immediate Notice to Vacate[2] proving that Defendant deliberately bypassed due process in an effort to force Plaintiff out. The sudden shift from ignoring Plaintiffs' complaints to issuing an immediate eviction—only after Defendant was publicly criticized—confirms the malicious and retaliatory intent behind this unlawful action.

C.     By allowing personal embarrassment to dictate official landlord actions, Defendant

---

[2] Utah bar published this guidance for landlords. Page 2 clearly breaks down for landlords how the law works: https://www.utahbar.org/wp-content/uploads/2023/03/12.-Landlord-Tenant-Break-out-Spring-Convention-2020.pdf

engaged in egregious misconduct, violating Utah Code § 57-22-5.5 and 42 U.S.C. § 3617, both of which prohibit landlords from retaliating against tenants for asserting their legal rights.

**Three-Day Notice to Vacate**

37.    On March 7, 2025, Defendant served Plaintiffs with an immediate three-day notice to vacate in direct retaliation for Plaintiffs' written complaint and assertion of rights under the FHA and ADA.

38.    Defendant alleged two (2) reasons for the notice to vacate. Those two alleged reasons are:

A.    Plaintiffs briefly possessing an unauthorized baby hamster despite immediate compliance upon receiving Defendant's initial notice to comply or vacate[3] and despite an explicit email in writing to Defendant from Plaintiff confirming compliance *f*and,

B.    The operation of an unauthorized business from the residence in violation of the lease agreement (Section 20, page 4).

**New Business Allegation as Pretext for Immediate Eviction**

39.    Plaintiffs were never previously warned or notified of any alleged unauthorized business

---

[3] Defendants' Notice to Comply or Vacate, issued on February 28, 2025, was legally defective as a matter of law because it failed to specify which pet was allegedly unauthorized, violating fundamental notice requirements under Utah Code § 78B-6-802. Proper notice must be clear and specific enough for a tenant to understand the alleged violation and take corrective action. A vague and ambiguous notice—such as one failing to identify the specific pet at issue—renders the entire notice legally unenforceable (*See Housing Authority of County of Salt Lake v. Delgado, 914 P.2d 1163, 1165 (Utah Ct. App. 1996), requiring specificity in eviction notices*).

Despite the legal invalidity of the notice, Plaintiff acted in good faith and complied, assuming the notice referred to a baby hamster (regardless of how petty, absurd or retaliatory it was on its face) and promptly removing it. However, Defendants are now attempting to use this same defective notice as an element in their March 7, 2025, Notice to Vacate. As a matter of law, a defective notice cannot serve as a valid basis for further eviction proceedings (*See Biesele v. Mattena, 119 P.3d 137, 142 (Utah Ct. App. 2005), holding that an invalid notice does not provide a lawful basis for eviction*).

By relying on an already void and unenforceable notice as a supporting ground for eviction, Defendants' March 7, 2025, Notice to Vacate is equally defective and must be invalidated. A fundamentally flawed process cannot create a legally enforceable eviction, and any attempt to proceed under these circumstances constitutes bad faith retaliation and an abuse of landlord-tenant law (*See Utah Code § 57-22-5.5, prohibiting retaliatory evictions*).

operations in their home, making Defendants' sudden inclusion of this accusation in the Notice to Vacate both baseless and retaliatory. Utah law requires landlords to provide tenants with notice and an opportunity to cure a lease violation before escalating to eviction when the alleged violation is curable. Here, Defendants failed to issue a Notice to Comply or Vacate, making the eviction procedurally improper.

40.     Defendants' claim that Angie, a licensed massage therapist, operated a massage therapy business from the residence is entirely speculative and unsupported by any factual or legal basis. Rather than relying on credible evidence or conducting a reasonable investigation, Defendants hastily issued an eviction notice based on three unfounded observations: (1) a random Google search result that included her business name, home address, and an unrelated image of the apartment complex, (2) the mere presence of a massage table in Plaintiffs' home, and (3) the sighting of an individual leaving the complex, whom Defendants arbitrarily assumed to be a client. These assertions amount to nothing more than conjecture, and at no point did Defendants make any attempt to verify their claim or provide Plaintiff an opportunity to comply before escalating to eviction.

41.     Even assuming arguendo that such a business was being operated—which it was not—the physical layout of Plaintiffs' home makes the allegation entirely implausible. Plaintiffs reside in a two-bedroom apartment, where their two minor daughters occupy one bedroom and the adults sleep in the other. This leaves only the shared living room as available space—an area used for everyday family activities and wholly unsuitable for professional massage therapy sessions.

42.     To accept Defendants' claim, one would have to believe that:

A.     Massage clients were receiving treatments in the middle of Plaintiffs' living room, where there is no privacy.

B.    Plaintiffs' entire family, including their minor children, would either have to remain confined in their bedrooms for extended periods or regularly encounter strangers receiving massages in their home whenever they needed to use the bathroom, access the kitchen, or simply leave the residence. This scenario is not only entirely unrealistic but also wholly inappropriate for a family living space.

C.    Clients would be expected to undress in a completely open area, which contradicts the fundamental expectation of privacy in professional massage therapy.

43.    Defendants' claim is not only factually unsupported but also legally deficient. Operating a business from a rental unit is considered a curable lease violation under Utah law. Had Defendants genuinely believed a lease violation occurred, they were required to issue a Notice to Comply or Vacate, allowing Plaintiffs the opportunity to cease the alleged conduct before eviction proceedings could lawfully commence. Instead, Defendants bypassed this requirement and issued an immediate Notice to Vacate, demonstrating that this accusation was nothing more than a pretext for eviction in retaliation for Plaintiffs' prior complaints and legal assertions.

**Defendants' Pattern of Encouraging Plaintiff to Move**

44.    On February 12, 2025, defendants encouraged Plaintiff in writing to vacate the premises after Plaintiff lawfully requested water heater repairs. Rather than fulfilling their legal obligation to maintain habitable conditions, defendants attempted to pressure Plaintiff into leaving instead of addressing the issue.

45.    On February 18, 2025, after falsely accusing Plaintiff of withholding a package that had been mistakenly delivered to his unit, Plaintiff issued a cease-and-desist notice, demanding that defendants stop making defamatory statements and limit communications to lease-related matters. The following day, on February 19, 2025, Jillian Penman again encouraged Plaintiff to

vacate, stating that Plaintiff appeared dissatisfied with the rental, despite Plaintiff's repeated affirmations of his right to remain in his home without retaliation for asserting tenant rights.

**Notice to Vacate**

46.    On March 7, 2025, defendants served Plaintiff with a three-day notice to vacate, skipping the legally required notice to comply or vacate, which is mandated for curable lease violations under Utah law. Defendants falsely claimed Plaintiff was operating an unauthorized business from his home, despite providing no prior warning or opportunity to cure the alleged violation. In reality, the accusation was a pretext, as Jillian Penman had recently admitted to searching for Plaintiff's wife's business name online and likely relied on an unrelated Google review to justify the eviction. This notice was issued only days after Plaintiff criticized defendants' conduct in a written complaint, further confirming its retaliatory nature.

47.    On March 8, 2025, in response to the notice to vacate, Plaintiff submitted a reasonable accommodation request under the FHA for a 45-day extension of the eviction deadline due to his disability-related needs. Rather than engaging in the required interactive process, defendants summarily denied the request the same day. Instead of considering alternative accommodations or assessing whether the extension imposed an undue burden, defendants conditioned any extension on Plaintiff signing a settlement agreement admitting to lease violations. This coercive tactic was a clear attempt to use Plaintiff's disability accommodation request as leverage to force him out, in violation of federal fair housing protections.

## **V. CAUSES OF ACTION**

**COUNT I – RETALIATION AND DISCRIMINATION UNDER THE FAIR HOUSING ACT**

(42 U.S.C. § 3617 – Interference, Coercion, and Intimidation)

48.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

49.    Under the Fair Housing Act (FHA), 42 U.S.C. § 3617, it is unlawful to coerce, intimidate, threaten, or interfere with any individual exercising protected rights under federal fair housing laws. Specifically, retaliation against tenants for requesting reasonable accommodations for disability-related needs constitutes unlawful discrimination prohibited by federal law. See *Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009).

50.    To establish a claim for retaliation and discrimination under the FHA, a plaintiff must demonstrate:

(A)    The plaintiff engaged in protected activity under the FHA;

(B)    The plaintiff suffered an adverse housing action; and

(C)    There is a causal connection between the protected activity and the adverse action. See *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001); *Bloch v. Frischholz*, 587 F.3d at 782; *Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31, 41 (2d Cir. 2015).

51.    Plaintiff has clearly established each required element under 42 U.S.C. § 3617:

A.    **Plaintiff Engaged in Protected Activity:**

i.    Plaintiff engaged in protected activities by:

a.    Requesting reasonable disability-related accommodations, including approval for his own Emotional Support Animal (ESA), which Defendants initially approved, as well as submitting a separate accommodation request for his spouse's disability-related ESA.

b.    Formally notifying Defendants multiple times, including in written communications on March 2, 2025, that excessive and persistent noise disturbances from the upstairs tenants were directly interfering with the therapeutic support provided by Plaintiff's previously approved

ESA, exacerbating his disability-related conditions and diminishing the effectiveness of the accommodation.

c.    Formally requesting a reasonable accommodation in the form of an extended eviction deadline due to his disability on March 7, 2025, citing well-established HUD guidelines and federal case law (*Giebeler v. M&B Assocs.*, 343 F.3d 1143 (9th Cir. 2003)).

ii.    Federal law recognizes that requesting reasonable accommodations and complaining about interference with accommodations constitute protected activities under the FHA. See *Rodriguez v. Village Green Realty, Inc.*, 788 F.3d at 41.

B.    **Adverse Housing Action by Defendants:**

i.    In direct retaliation for Plaintiff's protected activities, Defendants took adverse actions, including, but not limited to:

a.    Issuing an unlawful Three-Day Notice to Vacate on March 7, 2025, based on fabricated lease violations, such as falsely alleging that Plaintiff was operating an unauthorized business on the premises and improperly citing a previously corrected baby hamster issue as a lease violation. This notice was issued without providing Plaintiff the legally required opportunity to cure under Utah Code § 78B-6-802.

b.    Refusing Plaintiff's legitimate disability accommodation requests without engaging in any good-faith interactive process mandated by federal law.

c.    Continuously ignoring Plaintiff's documented reports of excessive noise disturbances interfering with his ESA, thereby diminishing the accommodation's intended benefit and effectiveness in violation of FHA protections.

ii.    Courts consistently recognize eviction attempts, denial of reasonable accommodation requests, and deliberate disregard for interference with approved disability accommodations as

adverse housing actions actionable under the FHA. See *Smith v. Powdrill*, 2013 WL 5786586, at *6 (C.D. Cal. Oct. 28, 2013).

C.      **Causal Link Between Protected Activity and Adverse Actions:**

i.      The retaliatory eviction notice dated March 7, 2025, issued by Defendants immediately following Plaintiff's written assertion of his federally protected rights—specifically addressing habitability concerns and noise-related interference with his ESA accommodation—demonstrates a clear causal connection between Plaintiff's protected activities and Defendants' adverse housing actions. The close temporal proximity and sequence of Defendants' actions strongly establish retaliatory intent and a causal nexus. See *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001) (close temporal proximity between protected activity and adverse action establishes causation).

ii.     Moreover, Defendants further demonstrated retaliatory and discriminatory animus by intentionally misusing Utah eviction procedures, issuing Plaintiff a three-day "Notice to Vacate" rather than the legally required "Notice to Comply or Vacate" under Utah Code § 78B-6-802. The law explicitly provides tenants an opportunity to correct alleged lease violations prior to eviction proceedings. By deliberately choosing the incorrect eviction method, Defendants attempted to exploit Plaintiff's presumed lack of familiarity with landlord-tenant laws, aiming to leverage Plaintiff's perceived ignorance to expedite Plaintiff's departure without legal opposition. This deliberate selection of improper eviction procedure confirms Defendants' retaliatory intent to intimidate and unlawfully evict Plaintiff from his home in violation of the Fair Housing Act. See *Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009) (recognizing improper eviction tactics as evidence of retaliatory intent).

D.      **Damages:**

i.    As a direct and proximate result of Defendants' retaliatory and discriminatory conduct, Plaintiff suffered substantial harm, including:

a.    Risk of immediate eviction and permanent damage to Plaintiff's rental record, significantly impairing Plaintiff's future housing opportunities.

b.    Severe emotional distress, anxiety, mental anguish, and exacerbation of Plaintiff's existing disability-related symptoms.

c.    Substantial financial burdens arising from the necessity of defending against retaliatory eviction proceedings and obtaining alternative housing.

d.    Interference with Plaintiff's federally protected rights to equal and nondiscriminatory access to housing.

E.    **Defendants' Actions Constitute Willful and Reckless Conduct:**

i.    Defendants acted intentionally, maliciously, and with deliberate indifference toward Plaintiff's federally protected rights, deliberately ignoring Plaintiff's repeated, detailed communications explicitly describing the detrimental impact excessive noise had on his ESA accommodation. Federal courts recognize deliberate indifference and retaliatory conduct as actionable for punitive damages under the FHA. See *Sabatini v. Reinstein*, 369 F. Supp. 3d 1066, 1079 (D. Nev. 2019).

52.    **Relief Requested:** Plaintiff seeks relief under the FHA, including:

A.    Injunctive relief prohibiting Defendants from further retaliatory or discriminatory eviction proceedings and compelling immediate compliance with FHA obligations, including effective enforcement of noise policies and protection of Plaintiff's ESA accommodation.

B.    Compensatory damages for emotional distress, housing instability, financial losses, and impairment of Plaintiff's federally protected housing rights resulting from Defendants'

discriminatory and retaliatory conduct.

C.    Punitive damages to deter future discriminatory and retaliatory conduct by Defendants.

D.    Attorneys' fees and litigation costs pursuant to 42 U.S.C. § 3613(c)(2).

E.    Declaratory relief confirming Defendants violated Plaintiff's rights under the FHA.

F.    Missed work wages for time to attend hearings and prepare for pleadings.

## COUNT II – FAILURE TO ACCOMMODATE UNDER THE ADA AND FHA

*(42 U.S.C. § 12131 et seq.; 42 U.S.C. § 3604(f))*

53.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

54.    The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., and the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f), require housing providers to provide reasonable accommodations that are necessary for individuals with disabilities to enjoy equal housing opportunities, except where granting such accommodations would cause undue burden. Federal law also requires housing providers to engage in an interactive process when evaluating accommodation requests. See *Giebeler v. M&B Associates*, 343 F.3d 1143, 1147 (9th Cir. 2003); *Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109, 1121 (D.C. 2005).

55.    Plaintiff has established all required elements for a failure-to-accommodate claim under federal law, as follows:

A.    **Qualified Disabilities and Accommodation Requests:**

i.    Plaintiff's spouse, Angela Andersen, suffers from medically documented disabilities—specifically Depressive Disorder and Generalized Anxiety Disorder—substantially limiting major life activities, including emotional stability, sleep, and daily functioning. On or about August 21, 2024, Plaintiff submitted a formal request for Angela to have an Emotional Support

Animal (ESA), supported by medical documentation from a licensed mental health professional, pursuant to the ADA and FHA.

ii.    Separately, Plaintiff himself has a documented disability, for which Defendants previously approved an emotional support animal (ESA) accommodation. This approved ESA is essential to Plaintiff's management of his disability-related conditions, providing necessary emotional and therapeutic support.

B.    **Unlawful Denial and Failure to Engage in Interactive Process:**

i.    Defendants unlawfully and summarily denied Angela Andersen's ESA accommodation request, incorrectly claiming that the medical documentation provided was insufficient due to the method (online telehealth) by which it was obtained, without engaging in the legally required interactive process. Federal law explicitly prohibits such outright denial without good-faith evaluation. See *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011).

ii.    Further, when Plaintiff explicitly informed Defendants, via multiple written complaints—including an email on March 2, 2025—that the excessive noise from upstairs neighbors was severely disrupting the therapeutic effectiveness of Plaintiff's already-approved ESA, Defendants deliberately ignored these complaints. Plaintiff clearly stated that the persistent and excessive noise was depriving him of the benefit of his disability-related ESA accommodation, thereby directly violating Defendants' obligation under federal law to ensure reasonable accommodations remain effective.

iii.    Further, Defendants refused to engage in the legally required interactive process before denying Plaintiff's FHA accommodation request for a move-out extension. The Fair Housing Act (FHA), 42 U.S.C. § 3604(f)(3)(B), requires landlords to engage in an interactive process to assess reasonable accommodation requests in good faith before issuing a denial. Jankowski Lee

& Assocs. v. Cisneros, 91 F.3d 891, 895 (7th Cir. 1996).

a.        On March 7, 2025, Plaintiff submitted a formal request for an extension to vacate due to

his disability, citing his right to a reasonable accommodation under the FHA. Rather than

assessing the request in good faith, Defendant Jillian Penman summarily denied it in an email

response. Instead of engaging in an interactive dialogue, she provided only a blanket refusal,

incorrectly asserting that "there is no documentation to establish a connection" that would allow

for greater time before eviction.

b.        This is a direct violation of federal law. Courts have consistently recognized that

landlords must provide reasonable accommodations, including extensions of eviction deadlines,

when necessary due to a tenant's disability. See Bhogaita v. Altamonte Heights Condo. Ass'n,

765 F.3d 1277, 1288 (11th Cir. 2014); Schaw v. Habitat for Humanity of Citrus Cnty., Inc., 938

F.3d 1259, 1265 (11th Cir. 2019).

c.        Even if Defendants disputed the need for an extension, they were legally required to

explore alternatives rather than issuing a blanket denial. See Jankowski, 91 F.3d at 895 (holding

that a landlord violates the FHA when it fails to consider reasonable alternatives). Instead,

Defendants failed to engage in any meaningful discussion and instead relied on an erroneous and

arbitrary documentation excuse, despite FHA standards requiring only minimal verification of

disability-related accommodations.

C.        **Refusal to Engage in Interactive Process and Retaliatory Actions:**

i.        Despite Plaintiff's explicit complaints, Defendants refused to meaningfully engage in the

required interactive process to address and resolve the disability-related accommodation issues,

including failing to adequately investigate or address noise disturbances significantly

undermining the effectiveness of Plaintiff's approved ESA. Instead, Defendants retaliated by

issuing an improper Three-Day Notice to Vacate on March 7, 2025, citing pretextual lease violations, including "violation of animal rules" directly relating to a baby hamster that Plaintiff had already removed from the home, and baseless claims about an unauthorized business activity. These actions violated federal protections against retaliation provided by the FHA and ADA. See *Smith v. Powdrill*, 2013 WL 5786586, at *6 (C.D. Cal. Oct. 28, 2013).

ii.      In addition, Defendants summarily rejected Plaintiff's request for a reasonable accommodation in the form of a 45-day extension of the eviction deadline, despite Plaintiff providing medical documentation and clearly establishing the nexus between his disability and the requested accommodation, as required by federal law. Such refusal without justification constitutes deliberate indifference under the ADA. See *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).

D.      **Damages:** Defendants' ongoing refusal to provide or maintain reasonable accommodations resulted in substantial and severe harm to Plaintiff, including:

i.      Severe emotional distress and exacerbation of disability-related conditions due to ongoing excessive noise disturbances rendering Plaintiff's previously-approved ESA ineffective.

ii.      Severe anxiety and emotional distress stemming from Defendants' retaliatory eviction attempts and deliberate disregard for Plaintiff's legitimate requests and medical documentation.

iii.      Financial hardship and instability directly attributable to the unlawful eviction actions and the subsequent need to secure alternative housing arrangements.

E.      **Deliberate Indifference and Intentional Discrimination:**

i.      Defendants exhibited deliberate indifference and willful disregard toward Plaintiff's federally protected rights by:

a.      Unlawfully denying his spouse's ESA request.

b.      Continuously ignoring Plaintiff's explicit notifications regarding the impact of excessive noise disturbances on his approved ESA accommodation.

c.      Failing to engage in the interactive process regarding Plaintiffs request for a reasonable accommodation in the form of a 45-day extension of the eviction deadline.

d.      Failing to explore alternative medical accommodations regarding Plaintiffs request for a reasonable accommodation in the form of a 45-day extension of the eviction deadline.

56.     **Relief Requested:** Plaintiff is entitled to relief under the ADA and FHA, including:

A.      Immediate injunctive relief ordering Defendants to remedy noise disturbances negatively affecting Plaintiff's approved ESA accommodation.

B.      Injunctive relief requiring Defendants to approve Angela Andersen's reasonable ESA accommodation request.

C.      Prohibition of further retaliatory eviction actions or discrimination against Plaintiff for asserting federally protected rights.

D.      Compensatory damages for emotional distress, exacerbation of Plaintiff's and his spouse's disability symptoms, housing instability, and financial hardship directly resulting from Defendants' violations.

E.      Punitive damages based on Defendants' intentional misconduct, deliberate indifference, and discriminatory practices in an amount to be determined by the court or at trial.

F.      Attorneys' fees, litigation costs, and other expenses pursuant to 42 U.S.C. § 12205 and 42 U.S.C. § 3613(c)(2).

G.      Any additional relief the Court deems just, equitable, and necessary under the circumstances.

**COUNT III – VIOLATION OF DUE PROCESS (42 U.S.C. § 1983)**

57.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

58.     Under 42 U.S.C. § 1983, any person acting under color of state law who deprives another of rights secured by the Constitution or federal law is liable to the injured party. The Fourteenth Amendment guarantees due process of law before the deprivation of life, liberty, or property. Specifically, procedural due process requires notice and a meaningful opportunity to be heard prior to deprivation. See *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970).

59.     **Defendants Acted Under Color of State Law:** Defendants, by virtue of initiating eviction proceedings and invoking Utah's statutory eviction process under Utah Code § 78B-6-802, acted under color of state law. Courts have recognized private entities as state actors under 42 U.S.C. § 1983 when they utilize state eviction procedures in a manner that directly implicates constitutional rights. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (private parties act under color of state law when using state legal processes improperly or unlawfully to deprive individuals of protected rights).

A.     Defendants, acting under the color of state law, violated Plaintiff's constitutional right to procedural due process guaranteed by the Fourteenth Amendment by engaging in the following actions:

60**.**    **Deprivation of Property Interest Without Due Process:** Defendants improperly initiated eviction proceedings through the issuance of an unlawful Three-Day Notice to Vacate on March 7, 2025, without providing Plaintiff any notice of or opportunity to cure the alleged lease violations, contrary to Utah law (Utah Code § 78B-6-802). Plaintiff holds a legitimate property interest under the Apartment Lease Contract dated August 12, 2024, a contractual interest protected by the Fourteenth Amendment. Federal courts recognize leasehold interests as

constitutionally protected property interests that require procedural due process prior to eviction. See *Greene v. Lindsey*, 456 U.S. 444, 450-51 (1982).

61. **Failure to Provide Legally Required Notice and Opportunity to Cure:** Utah Code § 78B-6-802 explicitly requires landlords to provide tenants an opportunity to correct curable lease violations before eviction proceedings may be initiated. The lease violations alleged by Defendants—specifically an unauthorized pet already remedied and an unsubstantiated claim of unauthorized business operation—are curable under Utah law. Defendants knowingly failed to comply with this statutory requirement, issuing instead an immediate Three-Day Notice to Vacate. This procedural failure deprived Plaintiff of legally mandated due process protections, constituting a clear procedural violation under the Fourteenth Amendment and actionable under § 1983. See *Greene v. Lindsey*, 456 U.S. 444, 456 (1982) (requiring meaningful notice before eviction).

62. R**etaliatory and Pretextual Nature of Eviction:** Defendants' eviction action was clearly retaliatory, driven by Plaintiff's assertion of legal rights protected under the Fair Housing Act, the ADA, and Utah habitability statutes, and exacerbated by Plaintiff's public criticism of Defendants' failure to address habitability and accommodation issues. Defendants deliberately bypassed statutory eviction safeguards to deprive Plaintiff of procedural protections guaranteed by state and federal law. This retaliatory conduct, utilizing state eviction procedures, constitutes a violation of Plaintiff's constitutional due process rights, entitling Plaintiff to relief under 42 U.S.C. § 1983. See *Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009) (holding retaliation for asserting rights constitutes actionable deprivation under federal law).

63. **Deprivation of Property Without Due Process:** Plaintiff possesses a constitutionally protected property interest in the continued occupancy of his rental unit, as established by the

Apartment Lease Contract. Defendants, acting under color of state law, attempted to deprive Plaintiff of this protected interest without following due process requirements, including the failure to provide adequate notice and an opportunity for a meaningful hearing or corrective action. Such actions clearly violate the procedural due process guarantees of the Fourteenth Amendment. See *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (holding due process requires adequate notice and meaningful opportunity to contest property deprivation).

64**.    Pattern of Harassment and Deprivation of Constitutional Rights:** Defendants engaged in a systematic pattern of harassment and intimidation, including repeated threats of eviction, fabrication of lease violations, refusal to comply with legally mandated habitability standards, refusal to engage in the interactive accommodation process, blanket denial of accommodation requests and retaliation against Plaintiff's lawful assertion of tenant and disability rights. These repeated actions were intended to intimidate Plaintiff and deprive him of secure housing without procedural protections, demonstrating a conscious and egregious disregard for constitutional guarantees. Such calculated deprivation violates Plaintiff's rights and establishes liability under § 1983. See *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (governmental deprivation of property rights without due process is unconstitutional).

65.    **Damages:** As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered significant harm, including:

A.    Severe emotional distress and anxiety caused by the imminent threat of unlawful eviction and resultant housing instability.

B.    Substantial financial damages incurred in seeking alternative housing arrangements and addressing the legal ramifications of Defendants' actions.

C.    Impairment of Plaintiff's constitutional rights and loss of enjoyment of secure housing.

66.    **Relief Requested:** Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, including:

A.    Monetary damages for emotional distress and financial losses directly resulting from Defendants' violation of Plaintiff's constitutional rights.

B.    Compensatory and consequential damages reflecting the loss of Plaintiff's right to procedural due process.

C.    Punitive damages to deter future unconstitutional conduct by Defendants.

D.    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

E.    Any further relief this Court deems equitable, just, and appropriate.

## COUNT IV – BREACH OF CONTRACT

(Utah Common Law - Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367)

67.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

68.    This Court has supplemental jurisdiction over this state-law claim pursuant to 28 U.S.C. § 1367 because the claim arises from the same nucleus of operative facts as Plaintiff's federal claims under the FHA, ADA, and § 1983.

69.    Plaintiff entered into a binding Apartment Lease Contract with Defendants on or about August 12, 2024, for the rental of 5024 W Frogs Leap Dr, Unit 1203, South Jordan, Utah 84009. This contract imposed reciprocal obligations on both parties, including Defendants' duty to maintain habitability, comply with Utah landlord-tenant laws, and act in good faith.

70.    **Defendants materially breached the lease agreement through the following actions:**

A.    **Failure to Maintain Habitability:** Defendants failed to provide a habitable dwelling by neglecting necessary repairs to the water heater and the bathroom hole in the cabinetry despite Plaintiff's repeated maintenance requests. Section 32(2) of the lease obligates the landlord to

"maintain fixtures, furniture, hot water, heating, and A/C equipment". Defendants' failure to

repair the water heater in a timely manner and total failure to repair the hole in the cabinetry in

which a family pet became trapped constituted a breach of their contractual and statutory duty to

provide a livable residence, in violation of Utah's Fit Premises Act, Utah Code § 57-22-3

B.       **Failure to Follow Lawful Eviction Procedures:** Defendants issued a Three-Day Notice

to Vacate instead of a Notice to Comply or Vacate, violating Utah Code § 78B-6-802, which

requires landlords to give tenants an opportunity to cure alleged lease violations before eviction.

The lease also provides that any termination of tenancy must comply with applicable laws, and

Defendants' failure to follow proper legal procedures constitutes a breach of contract.

C.       **Retaliatory and Bad Faith Conduct:** Defendants engaged in retaliation against Plaintiff

for asserting his rights, including filing maintenance complaints and requesting reasonable

accommodations. This rendered the lease conditions unfair and unlawful, as the contract

incorporates compliance with federal and state housing laws, including the Fair Housing Act, 42

U.S.C. § 3617. The retaliatory eviction efforts directly violate Utah Code § 57-21-5, which

prohibits landlords from retaliating against tenants for asserting their rights.

D.       **Constructive Eviction (Encouraging Tenant to Leave Instead of Fixing Issues)**:

Instead of fixing the defective water heater, Defendants encouraged Plaintiff to vacate on

February 12, 2025. This constitutes constructive eviction under Utah law (*Wade v. Jobe, 818

P.2d 1006, 1010 (Utah 1991)*) because the landlord deliberately made living conditions

uninhabitable in an effort to pressure the tenant into leaving.

E.       **Failure to Honor Good Faith and Fair Dealing Obligations:** Every contract imposes

an implied covenant of good faith and fair dealing, requiring parties to act fairly and not deprive

the other party of the contract's intended benefits. Defendants violated this duty by engaging in a

pattern of retaliatory and bad-faith conduct, effectively undermining the lease's purpose and Plaintiff's rights as a tenant.

Defendants' violations include, but are not limited to:

i.        **Denial of a Reasonable Accommodation for an ESA** – Defendants refused to grant Plaintiff's wife an Emotional Support Animal (ESA) despite her documented disability and valid medical documentation.

ii.       **Retaliatory Eviction Attempts** – Defendants escalated to a Three-Day Notice to Vacate without issuing a prior Notice to Comply or Vacate, as required by Utah Code § 78B-6-802 for curable violations. The eviction was issued in direct retaliation for Plaintiff's habitability complaints, assertion of tenant rights, and written criticisms of management.

a.        *Operating a business from a home is a curable violation:* Utah law treats operating a business from a rental as a curable lease violation, requiring landlords to first issue a notice to comply or vacate. Utah Code § 78B-6-802(1)(d) states that for curable violations, landlords must provide written notice and allow time to correct the issue. Courts confirm that lease breaches that do not pose immediate harm must allow tenants a chance to fix them, as in Golden Forest Holdings, LLC v. Noyes, 2017 UT App 150, ¶ 16. Because defendants failed to provide this notice, the eviction attempt was unlawful.

b.        *Defendants admitted to not providing notice:*  In a March 8, 2025 email, defendants admitted they did not issue a notice to comply, instead claiming the lease agreement itself served as notice. This is legally incorrect. Utah Code § 78B-6-802 requires a specific written notice at the time of the violation, not reliance on lease terms alone. Courts have held that a lease clause does not satisfy statutory notice requirements, as seen in Housing Authority of County of Salt Lake v. Delgado, 914 P.2d 1163, 1165 (Utah Ct. App. 1996). By failing to provide the required

notice, defendants invalidated their own eviction attempt as a matter of law.

iii.    **Failure to Maintain the Premises** – Defendants failed to make timely and necessary repairs to the water heater, forcing Plaintiff's family to endure months of inadequate hot water or no hot water at all. Despite multiple repair requests over a span of nearly five months, Defendants only resolved the issue after Plaintiff threatened legal action. Defendants further attempted to coerce Plaintiff into vacating the premises rather than fulfilling their legal obligations, constituting constructive eviction (*Wade v. Jobe, 818 P.2d 1006, 1010 (Utah 1991)*).

iv.    **Arbitrary and Abusive Lease Enforcement** – Defendants issued a Notice to Comply or Vacate over a single baby hamster, despite the lease permitting up to two pets. Instead of allowing Plaintiff's minor child to keep the hamster and assessing a reasonable pet fee, Defendants weaponized the lease to justify punitive action.

v.    **Bad-Faith Use of Eviction Procedures** – Defendants falsely alleged that Plaintiff's spouse was operating a business from the residence without prior notice, warning, or opportunity to cure. They relied on speculative online search results rather than factual evidence, bypassing due process and failing to provide the legally required notice. Additionally, Defendants knowingly made false claims regarding Plaintiff's compliance with the Notice to Comply or Vacate issued on February 28th 2025 regarding a baby hamster. Plaintiff explicitly confirmed in writing on March 1, 2025, that the baby hamster had been removed from the home, yet Defendants proceeded with eviction proceedings under the pretense that Plaintiff had failed to comply. This deliberate misrepresentation constitutes a clear abuse of eviction procedures and further evidences their retaliatory intent.

vi.    **Denial of Reasonable Accommodation for an Eviction Extension and Refusal to Engage in the Interactive Process** – On March 7, 2025, at 3:45 PM, Plaintiff submitted a

written reasonable accommodation request under the Fair Housing Act (FHA) and Americans with Disabilities Act (ADA), seeking an extension to move due to disability-related hardship. Defendants outright denied the request without engaging in the legally required interactive process to discuss or assess Plaintiff's needs. Instead of complying with 42 U.S.C. § 3604(f)(3)(B), which mandates reasonable accommodations be considered to ensure equal housing opportunity, Defendants issued a blanket refusal and attempted to force Plaintiff into signing an agreement affirming the eviction's validity as a precondition for even considering an extension. Such a demand is explicitly prohibited under Giebeler v. M&B Associates, 343 F.3d 1143, 1154 (9th Cir. 2003), which held that landlords cannot condition accommodations on tenant concessions. Furthermore, their refusal to engage in any dialogue or explore alternative accommodations violates Jankowski Lee & Assocs. v. Cisneros, 91 F.3d 891, 895 (7th Cir. 1996), which establishes that landlords must work in good faith to find reasonable solutions for disabled tenants.

vii.    **Defamation and False Accusations Against Plaintiff** – On February 18, 2025, defendants falsely implied in writing that plaintiff and his spouse had wrongfully withheld another tenant's package, imputing dishonest or criminal behavior. Under Utah law, statements that falsely suggest dishonesty or criminality constitute defamation per se (Jacob v. Bezzant, 2009 UT 37, ¶ 26). The accusation was made without any evidence or inquiry, causing unwarranted scrutiny and reputational harm.

71.    **Damages:** As a direct and proximate result of Defendants' breaches, Plaintiff has suffered damages, including but not limited to:

A.    Financial damages resulting from the costs of securing alternative housing, increased living expenses, and expenses related to addressing Defendants' wrongful eviction attempts.

B.     Lost wages due to missed work required to respond to Defendants' wrongful eviction efforts, including time spent drafting legal pleadings, attending court hearings, and coordinating relocation due to Defendants' breach of contract and retaliatory conduct.

C.     Emotional distress and inconvenience arising from Defendants' unlawful and retaliatory conduct.

D.      Attorney's fees and litigation costs incurred in attempting to enforce contractual and statutory rights.

72.     **Relief Requested:**  Plaintiff is entitled to relief, including:

A.     Actual damages for financial losses suffered due to Defendants' contractual breaches.

B.     Contract damages for the difference in value between the habitable unit promised under the lease and the defective unit provided.

C.      Attorneys' fees and litigation costs pursuant to applicable law.

D.     Any other relief deemed just and appropriate by the Court.

**COUNT V – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

(Utah Common Law - Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367)

73.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

74.     This Court has supplemental jurisdiction over this state-law claim pursuant to 28 U.S.C. § 1367 because the claim arises from the same nucleus of operative facts as Plaintiff's federal claims under the FHA, ADA, and § 1983.

75.     Every contract, including the Apartment Lease Contract between Plaintiff and Defendants entered into on or about August 12, 2024, carries with it an implied covenant of good

faith and fair dealing. Under this covenant, each party must perform contractual duties honestly, fairly, and in a manner consistent with the parties' justified expectations, so that neither party undermines or deprives the other of the benefits reasonably expected from the contract. See *Oakwood Village LLC v. Albertsons, Inc.*, 104 P.3d 1226 (Utah 2004) (holding that breach of the implied covenant occurs when conduct by one party unjustifiably impairs the contractual rights of the other).

76.    Defendants breached this implied covenant of good faith and fair dealing through conduct that was unfair, retaliatory, oppressive, and contrary to the spirit and purpose of the lease agreement as found and provided for above.

77.    **Damages:** As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered substantial harm, including, but not limited to:

A.    Financial losses associated with the need to secure alternative housing, increased living expenses, and legal fees.

B.    Severe emotional distress, anxiety, and inconvenience stemming from the fear and uncertainty of retaliatory eviction.

C.    Deprivation of Plaintiff's right to quiet enjoyment and use of their residence as intended under the lease.

78.    **Relief Requested:** Given Defendants' intentional, retaliatory, and egregious disregard for Plaintiff's rights and interests under the contract and applicable law, Plaintiff is entitled to the following relief:

A.    Actual and consequential damages for the financial losses and emotional distress directly resulting from Defendants' breaches.

B.      Punitive damages, justified by Defendants' intentional misconduct and reckless

indifference to Plaintiff's rights and well-being, consistent with standards set forth under

applicable Utah and federal law.

C.      Attorney's fees and litigation costs incurred as a direct result of Defendants' bad faith

actions.

D.      Any other equitable or legal relief the Court deems appropriate and just under the

circumstances.

## COUNT VI – ABUSE OF PROCESS

(Utah Common Law - Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367)

79.      Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully

set forth herein.

80.      This Court has supplemental jurisdiction over this state-law abuse of process claim

pursuant to 28 U.S.C. § 1367, as it arises from the same nucleus of operative facts that underlie

Plaintiff's federal claims asserted in this action, forming part of the same case or controversy.

81.      Under Utah law, a claim for abuse of process requires Plaintiff to demonstrate:

A.      An ulterior purpose behind Defendants' use of legal process, and

B.      A willful act in the use of process that is not proper in the regular conduct of legal

proceedings. See Hodges v. Gibson Prods. Co., 811 P.2d 151, 156 (Utah 1991).

**Defendants' Abuse of Legal Process**

82.      Defendants engaged in abuse of process by misusing the eviction process as a retaliatory

tool rather than for a legitimate legal purpose.

83.      **Ulterior purpose:** The March 7, 2025 three-day notice to vacate was issued not due to a

legitimate lease violation but in direct retaliation for Plaintiff's habitability complaints, assertion

of legal rights, and criticism of Defendants' failure to address issues such as defective hot water, noise complaints, and ESA accommodations. The abrupt escalation to eviction proceedings, despite Plaintiff's compliance with prior notices, demonstrates Defendants' intent to use eviction as a punitive measure rather than a lawful remedy.

84.     **Improper use of legal process:** Defendants improperly escalated to an immediate three-day notice to vacate rather than issuing a notice to comply or vacate, as required by Utah Code § 78B-6-802 for curable violations. Defendants falsely alleged Plaintiff was operating a business without first providing any notice, investigation, or opportunity to cure, violating Utah's statutory due process requirements. Further, Defendants continued with eviction despite Plaintiff's documented compliance with prior notices, including the removal of the baby hamster. This demonstrates an intentional misuse of legal process.

85.     Additionally, Defendants manipulated legal procedures by falsely asserting that no separate notice was required because the lease agreement itself served as sufficient notice—an argument expressly rejected by Utah courts, which require specific statutory notice before eviction. See Housing Authority of County of Salt Lake v. Delgado, 914 P.2d 1163, 1165 (Utah Ct. App. 1996).

86.     Defendants' misuse of eviction procedures was part of a broader campaign of harassment, including attempts to coerce Plaintiff into moving out rather than fulfilling their legal obligations to maintain habitable conditions. This includes:

A.     Encouraging Plaintiff to vacate instead of repairing the defective water heater (February 12, 2025).

B.     Ignoring habitability complaints and only acting after Plaintiff threatened legal action.

C.     Weaponizing lease enforcement to target Plaintiff for unrelated and meritless allegations.

87.      **Damages**: As a direct and proximate result of Defendants' abuse of process, Plaintiff has suffered substantial harm, including, but not limited to:

A.      Legal fees and costs incurred in defending against an unlawful eviction.

B.      Severe emotional distress and anxiety caused by the fear and uncertainty of wrongful eviction.

C.      Reputational damage within the apartment community due to Defendants' false and baseless accusations.

D.      Financial hardship stemming from the need to secure alternative housing under crisis conditions.

88.      **Relief Requested:** Given Defendants' willful misuse of legal proceedings and retaliatory abuse of process, Plaintiff is entitled to the following relief:

A.      Actual and consequential damages for legal expenses, financial losses, and emotional distress directly resulting from Defendants' misconduct.

B.      Punitive damages due to Defendants' intentional and egregious misuse of eviction proceedings.

C.      Attorney's fees and litigation costs incurred in defending against Defendants' wrongful legal actions.

D.      Any other equitable or legal relief the Court deems just and appropriate.

## COUNT VII – FAILURE TO TRAIN

(Utah Common Law - Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367)

89.      Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

90.      This Court has supplemental jurisdiction over this state-law failure to train claim pursuant

to 28 U.S.C. § 1367, as it arises from the same nucleus of operative facts that underlie Plaintiff's

federal claims asserted in this action, forming part of the same case or controversy.

91.     Under Utah law and general principles of negligence, an employer may be held liable for

failure to train where:

A.     The employer had a duty to properly train an employee in areas essential to their job

responsibilities.

B.     The employer failed to provide adequate training.

C.     The lack of training directly resulted in harm to another party. See J.H. by and through

D.H. v. West Valley City, 840 F.3d 1153, 1164 (10th Cir. 2016).

**Defendants' Failure to Train Jillian Penman**

92.     Defendants, as owners and operators of the apartment complex, had a duty to properly

train their employees, including Regional Manager Jillian Penman, in fair housing laws,

reasonable accommodation procedures, proper eviction procedures, and tenant rights under both

state and federal law.

93.     Defendants failed to provide adequate training to Jillian Penman, who engaged in

multiple unlawful and retaliatory actions against Plaintiff, including but not limited to:

A.     Denying a reasonable accommodation request for an ESA based on legally invalid

reasoning, including improperly rejecting a valid ESA letter.

B.     Issuing or approving an unlawful three-day notice to vacate without following Utah Code

§ 78B-6-802's requirement for a notice to comply or vacate.

C.     Falsely asserting that no additional notice was required for eviction because the lease

agreement itself was sufficient notice, a claim contrary to Utah law.

D.     Engaging in retaliatory conduct, including escalating to eviction proceedings in response

to Plaintiff's habitability complaints, ESA request, and assertion of tenant rights.

E.      Participating in or approving defamatory statements falsely implying Plaintiff had

wrongfully withheld another tenant's package, imputing dishonest or criminal behavior.

F.      Failing to enforce noise policies in a non-discriminatory manner, despite Plaintiff's

multiple complaints about excessive disturbances affecting his ability to peacefully reside in the

apartment.

G.      Failing to engage in the legally required interactive process after Plaintiff submitted a

reasonable accommodation request under the FHA on March 7, 2025, seeking a 45-day

extension to the eviction notice due to a documented disability. Rather than engaging in a

meaningful discussion, Defendants, through Jillian Penman, summarily denied the request on

March 8, 2025, claiming without legal basis that accommodations could not extend an eviction

deadline. This refusal ignored HUD guidelines and federal case law that explicitly recognize

eviction extensions as reasonable accommodations when necessary for a tenant's disability.

H.      Failing to consider or offer any reasonable alternative accommodations before denying

Plaintiff's request. Instead of exploring options, Defendants conditioned any extension on

Plaintiff signing a settlement agreement waiving rights related to the eviction, which is an

improper and coercive practice. Federal law requires landlords to assess whether an

accommodation imposes an undue burden before denying it, yet Defendants refused to conduct

any such analysis.

94.     The actions taken by Jillian Penman demonstrate a fundamental lack of training in

essential housing and tenant rights, resulting in unlawful and improper actions that caused

significant harm to Plaintiff.

95.     Defendants' failure to properly train and supervise Jillian Penman was the direct and

proximate cause of Plaintiff's injuries, as proper training in fair housing regulations, eviction procedures, and tenant protections would have prevented many of the unlawful actions taken against Plaintiff.

96.    **Damages:** As a direct and proximate result of Defendants' failure to train, Plaintiff has suffered substantial harm, including, but not limited to:

A.    Legal fees and costs incurred in defending against unlawful eviction actions and seeking redress for wrongful conduct.

B.    Severe emotional distress, anxiety, and hardship caused by retaliatory actions, improper eviction proceedings, and unlawful denial of reasonable accommodations.

C.    Reputational harm within the apartment community due to false and defamatory statements made under the authority of an improperly trained employee.

D.    Financial hardship resulting from the need to secure alternative housing and defend against baseless legal actions.

97.    **Relief Requested:** Given Defendants' failure to properly train Jillian Penman and their negligent oversight of her unlawful conduct, Plaintiff is entitled to the following relief:

A.    Actual and consequential damages for financial losses, legal costs, and emotional distress caused by Defendants' negligence.

B.    Punitive damages due to Defendants' reckless disregard for their legal obligations to properly train employees handling critical housing matters.

C.    Attorney's fees and litigation costs incurred as a direct result of Defendants' failure to train and supervise their employees.

D.    Any other equitable or legal relief the Court deems just and appropriate.

## COUNT VIII – FAILURE TO SUPERVISE

(Utah Common Law - Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367)

98.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

99.    This Court has supplemental jurisdiction over this state-law failure to supervise claim pursuant to 28 U.S.C. § 1367, as it arises from the same nucleus of operative facts that underlie Plaintiff's federal claims asserted in this action, forming part of the same case or controversy.

100.    Under Utah law, an employer may be held liable for failure to supervise when:

A.    The employer has a duty to oversee the actions of its employees to prevent foreseeable harm.

B.    The employer knew or should have known that the employee was engaging in improper or unlawful conduct.

C.    The employer failed to take corrective action, allowing the employee's misconduct to continue and cause harm. See Clark v. Pangan, 2000 UT 37, ¶ 14, 998 P.2d 268.

Defendants' Failure to Supervise Jillian Penman

101.    Defendants had a duty to properly supervise their employees, including Regional Manager Jillian Penman, to ensure compliance with fair housing laws, reasonable accommodation procedures, proper eviction practices, and tenant rights under both state and federal law.

102.    Defendants failed to adequately supervise Jillian Penman, despite her repeated improper and unlawful actions, including but not limited to:

A.    Wrongfully denying Plaintiff's wife's FHA reasonable accommodation ESA request.

B.    Wrongfully denying Plaintiff's FHA reasonable accommodation request for a 45-day eviction extension on March 8, 2025, without conducting the legally required interactive process.

C.      Issuing or approving an improper three-day notice to vacate without following Utah Code § 78B-6-802's requirement for a notice to comply or vacate.

D.      Falsely asserting that no additional notice was required for eviction because the lease agreement itself constituted sufficient notice, contradicting Utah law and established legal precedent.

E.      Engaging in retaliatory conduct, including pursuing eviction proceedings in response to Plaintiff's habitability complaints, ESA request, and assertion of tenant rights.

F.      Participating in or approving defamatory statements falsely implying Plaintiff had wrongfully withheld another tenant's package, imputing dishonest or criminal behavior.

G.      Failing to enforce noise policies fairly and equitably, ignoring Plaintiff's repeated complaints about excessive disturbances that interfered with his ability to reside peacefully in the apartment.

103.    Defendants knew or should have known of Jillian Penman's unlawful and retaliatory conduct but failed to take appropriate action to correct it. Instead, they allowed her to continue engaging in unfair, discriminatory, and bad-faith actions that caused direct harm to Plaintiff.

104.    Had Defendants properly supervised Jillian Penman and ensured she adhered to legal obligations, Plaintiff would not have been subjected to unlawful eviction actions, defamation, or the denial of his reasonable accommodation request. Defendants' failure to supervise was a direct and proximate cause of Plaintiff's damages.

105.    **Damages:** As a direct and proximate result of Defendants' failure to supervise, Plaintiff has suffered substantial harm, including, but not limited to:

A.      Legal fees and costs incurred in defending against wrongful eviction actions and seeking redress for unlawful conduct.

B.      Severe emotional distress, anxiety, and hardship caused by retaliatory actions, defamation, and unlawful denial of reasonable accommodations.

C.      Reputational harm within the apartment community due to false and defamatory statements made under the authority of an unsupervised employee.

D.      Financial hardship stemming from the need to secure alternative housing and defend against baseless legal actions.

106.    **Relief Requested:** Given Defendants' failure to properly supervise Jillian Penman and their negligent oversight of her unlawful conduct, Plaintiff is entitled to the following relief:

A.      Actual and consequential damages for financial losses, legal costs, and emotional distress caused by Defendants' negligence.

B.      Punitive damages due to Defendants' reckless disregard for their legal obligations to properly supervise employees handling critical housing matters.

C.      Attorney's fees and litigation costs incurred as a direct result of Defendants' failure to supervise their employees.

D.      Any other equitable or legal relief the Court deems just and appropriate.

## COUNT IX – DEFAMATION

(Utah Common Law - Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367)

107.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

108.    This Court has supplemental jurisdiction over this state-law defamation claim pursuant to 28 U.S.C. § 1367(a)**,** as the claim arises from the same nucleus of operative facts that underlie Plaintiff's federal claims asserted in this action, forming part of the same case or controversy.

109.    Under Utah law, a claim for defamation requires Plaintiff to demonstrate:

A.    A false and defamatory statement concerning Plaintiff;

B.    An unprivileged publication of the statement to a third party;

C.    Fault amounting at least to negligence; and

D.    Resulting damages. See *West v. Thomson Newspapers*, 872 P.2d 999, 1008 (Utah 1994).

Defendants' Defamatory Actions

110.    On February 18, 2025, Olympus at Daybreak, through its authorized representatives, including Jillian Penman, Carmin Pebley, and Oliver C., transmitted an email to Plaintiff explicitly stating:

*"Please return the package to our office so we may deliver it to its rightful owner as soon as possible."*

111.    This statement was false, misleading, and defamatory. It directly implied that Plaintiff and his spouse had wrongfully or intentionally withheld another tenant's package, imputing dishonest or criminal behavior.

112.    Defendants negligently, or with reckless disregard for the truth, failed to undertake any reasonable inquiry or investigation before making this defamatory accusation. The absence of factual inquiry demonstrates Defendants' negligence or reckless disregard toward the falsity of their implication.

113.    Defendants not only falsely accused Plaintiff in writing but also circulated this false implication internally, including to Regional Manager Jillian Penman, thereby satisfying the publication requirement for defamation.

114.    Further, Olympus at Daybreak's actions were not limited to the written accusation. Plaintiff and his spouse were subjected to harassment when, on February 17, 2025, a former tenant appeared at their door in the evening, demanding the package after being encouraged by

the apartment complex to do so. Defendants' direct involvement in prompting a third party to confront Plaintiff at his residence further demonstrates their recklessness and negligence in handling the matter.

115.    Defendants' defamatory statement was communicated without privilege, exceeded any legitimate business purpose, and caused Plaintiff substantial embarrassment, humiliation, emotional distress, anxiety, and significant harm to his reputation within the apartment community.

116.    **Damages:** Defendants' false and defamatory statement directly imputed criminal conduct by suggesting that Plaintiff and his spouse wrongfully withheld another tenant's property. Wrongful possession or retention of another's mail can constitute a federal crime under 18 U.S.C. § 1708, and statements falsely implying criminal activity are inherently damaging under Utah law. See Jacob v. Bezzant, 2009 UT 37, ¶ 26.

117.    Under well-established Utah law, false statements that impute criminal behavior are presumed to cause harm, eliminating the need for Plaintiff to prove specific financial losses. See West v. Thomson Newspapers, 872 P.2d 999, 1013 (Utah 1994). Defendants' accusation—made without investigation or factual basis—caused immediate reputational harm and emotional distress.

118.    As a direct and proximate result of Defendants' defamatory statements and actions, Plaintiff suffered damages including but not limited to:

A.    Emotional distress, anxiety, humiliation, embarrassment, and loss of enjoyment of his residence.

B.    Injury to his reputation and standing within the residential community.

C.    Aggravation and exacerbation of Plaintiff's existing disability symptoms due to

heightened stress and emotional trauma.

119.    **Punitive Damages:** Defendants acted with reckless disregard for the truth by making a baseless accusation that falsely implied Plaintiff engaged in unlawful conduct. Their statement was issued without any factual inquiry, despite the ease of verifying whether Plaintiff had ever taken possession of the package in question.

120.    Because Defendants' false accusation suggested criminal wrongdoing, their conduct is particularly egregious. Utah law allows for punitive damages when a defendant acts with malice, oppression, or reckless disregard for the rights of others. Defendants' actions meet this standard, justifying an award of punitive damages to deter similar misconduct in the future.

121.    **Relief Requested:** Plaintiff respectfully requests judgment against Defendants, and each of them, as follows:

A.    General and special compensatory damages as determined by the Court.

B.    Punitive damages sufficient to deter Defendants from repeating defamatory statements.

C.    Reasonable attorneys' fees and litigation costs as permitted by law.

D.    Any additional equitable or legal relief this Court deems just and proper.

### COUNT X – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

(Utah Common Law - Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367)

122.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

123.    This Court has supplemental jurisdiction over this state-law claim pursuant to 28 U.S.C. § 1367 because the claim arises from the same nucleus of operative facts as Plaintiff's federal claims under the FHA, ADA, and § 1983.

124.    Under Utah law, negligent infliction of emotional distress occurs when a defendant's

negligent conduct foreseeably and proximately causes emotional harm to a plaintiff, especially

when such emotional distress is accompanied by physical manifestations or arises from

circumstances involving a special relationship or contractual duty. See *Johnson v. Rogers*, 763

P.2d 771, 779 (Utah 1988) (recognizing negligent infliction of emotional distress claims where a

defendant breaches a duty owed to the plaintiff, resulting in emotional harm).

125.    Defendants owed Plaintiff specific and affirmative duties pursuant to the Apartment

Lease Contract entered into on or about August 12, 2024, as well as statutory duties under Utah

landlord-tenant laws (Utah Code § 57-22-3 and § 57-22-4) and federal housing laws, including

the Fair Housing Act, 42 U.S.C. § 3604(f), and the Americans with Disabilities Act (ADA), 42

U.S.C. § 12101 et seq. These duties included obligations to:

A.    Maintain the premises in a habitable and safe condition.

B.    Provide timely and adequate responses to requests for essential maintenance and

habitability issues.

C.    Properly and fairly respond to accommodation requests under the FHA and ADA.

D.    Follow lawful eviction procedures and refrain from retaliatory actions.

126.    Defendants breached their duties of care through negligent actions and inactions,

including but not limited to:

A.    **Persistent Negligence in Handling Habitability Issues:** Defendants repeatedly

neglected Plaintiffs' multiple maintenance requests for repair or replacement of a defective water

heater, spanning from September 2024 through February 2025. Despite Plaintiffs clearly

communicating the severity of the situation—including lack of reliable hot water in winter and

significant disruption to daily life—Defendants ignored and inadequately addressed these

concerns until Plaintiffs explicitly threatened legal action. Defendants' persistent neglect caused

predictable and severe emotional stress, exacerbated by winter conditions, privacy invasions

from repeated ineffective repairs, and uncertainty about living conditions, all of which constitute

actionable emotional distress under Utah law. See *Wade v. Jobe*, 818 P.2d 1006 (Utah 1991)

(recognizing landlord liability for negligent failure to maintain habitability).

B.      **Failure to Properly Process and Respond to Plaintiff's Wife's ESA Accommodation**

**Request:** Defendants wrongfully denied Plaintiff's wife's request for an emotional support

animal accommodation, failing to comply with federal fair housing laws.

C.      **Negligence in Responding to Plaintiffs Requests for Reasonable Accommodations:**

Defendants negligently refused or ignored Plaintiff's reasonable accommodation requests related

to his documented disabilities, despite legal obligations under the Fair Housing Act and ADA to

engage in an interactive process. Their failures include:

i.      Ignoring the impact of noise disturbances on Plaintiff's ESA accommodation, despite

multiple complaints that excessive noise was exacerbating his disability symptoms. Defendants

failed to take action or explore accommodations.

ii.      Denying Plaintiff's March 7, 2025 request for a 45-day eviction extension without

assessing whether it imposed an undue burden, instead rejecting it outright on March 8, 2025.

iii.      Refusing to engage in the required interactive process, making no effort to discuss

potential solutions or alternatives before denying the request.

iv.      Conditioning any extension on Plaintiff signing a settlement agreement admitting to lease

violations, an improper and coercive demand contrary to federal housing laws.

v.      Defendants' refusal to engage in meaningful discussions foreseeably caused Plaintiff

significant emotional distress and exacerbated his disability-related symptoms. Courts recognize

the inherent harm caused by housing discrimination and denial of reasonable accommodations.

See Bhogaita v. Altamonte Heights Condo. Ass'n, 765 F.3d 1277, 1288 (11th Cir. 2014).

D.    **Negligent Conduct in Eviction Proceedings:** Defendants negligently and improperly issued eviction notices without following statutory requirements under Utah Code § 78B-6-802, including failure to provide Plaintiff with legally required opportunities to cure alleged lease violations before eviction. Defendants' failure to comply with procedural safeguards created foreseeable distress, as Plaintiff faced sudden housing insecurity, displacement, and uncertainty about stable housing for Plaintiff's family, including minor children. Courts recognize eviction proceedings as inherently stressful, particularly when improperly initiated, thus supporting claims for emotional distress arising from negligent eviction practices. See *Johnson v. U.S. Dep't of Agric.*, 734 F.2d 774, 789 (11th Cir. 1984) (acknowledging eviction as inherently stressful and capable of causing severe emotional harm).

127.    **Foreseeability of Emotional Distress:** The emotional distress suffered by Plaintiff—including anxiety, severe stress, fear of homelessness, exacerbation of disability-related symptoms, insomnia, loss of appetite, and impaired family stability—was entirely foreseeable given the nature of Defendants' negligent conduct. Defendants were fully aware, or reasonably should have been aware, of the direct psychological impact of their negligent and unlawful actions, particularly given Plaintiff's repeated communications explicitly describing emotional hardship and housing instability.

128.    **Damages:** As a direct and proximate result of Defendants' negligence, Plaintiff experienced substantial emotional distress accompanied by physical manifestations, such as increased anxiety, insomnia, headaches, gastrointestinal symptoms, and worsening mental health conditions. Plaintiff additionally suffered tangible financial harm, housing instability, and incurred expenses directly associated with responding to Defendants' negligent conduct and

threats of eviction.

129.    **Relief Requested:** Plaintiff therefore seeks damages from Defendants for negligent infliction of emotional distress, including:

A.    Compensation for emotional pain, suffering, and mental anguish.

B.    Compensation for physical symptoms and exacerbation of existing medical conditions caused by Defendants' negligence.

C.    Reimbursement for related medical and psychological treatment, if incurred.

D.    Recovery for consequential financial losses, including costs associated with housing instability, relocation, and legal expenses.

E.    Any additional relief this Court deems just and appropriate.

### COUNT XI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(Utah Common Law - Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367)

130.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

131.    This Court has supplemental jurisdiction over this state-law claim pursuant to 28 U.S.C. § 1367 because the claim arises from the same nucleus of operative facts as Plaintiff's federal claims under the FHA, ADA, and § 1983.

132.    To establish a claim for intentional infliction of emotional distress ("IIED") under Utah law, Plaintiff must demonstrate that Defendants intentionally or recklessly engaged in conduct that was outrageous and intolerable, offended generally accepted standards of decency, and directly resulted in severe emotional distress. See *Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 535 (Utah 2002) (setting forth elements for intentional infliction of emotional distress).

133.    Defendants' conduct towards Plaintiff was both intentional and reckless, extreme,

outrageous, and wholly unjustifiable, exceeding all bounds tolerated by a civilized community. Specifically, Defendants engaged in the following extreme and outrageous actions:

A.    **Deliberate and Malicious Withholding of Essential Repairs:** Defendants knowingly and intentionally withheld essential maintenance repairs, including repeatedly refusing to replace or effectively repair a defective water heater, despite Plaintiffs' numerous urgent complaints and requests from September 2024 through February 2025. Defendants' repeated refusal was intended to pressure Plaintiff into vacating the apartment prematurely, evidenced by Defendant Penman's express written suggestions to terminate the tenancy rather than provide adequate repairs, constituting constructive eviction. Utah courts have recognized that a landlord's deliberate withholding of essential services, particularly in winter conditions, can constitute outrageous and intolerable conduct sufficient to support a claim for intentional infliction of emotional distress. See *Wade v. Jobe*, 818 P.2d 1006, 1010-1012 (Utah 1991).

B.    **Retaliation for Plaintiff's Exercise of Legal Rights, Including Disability Accommodations:** Defendants intentionally retaliated against Plaintiff due to Plaintiff's assertion of his legally protected rights under the Fair Housing Act (FHA), 42 U.S.C. § 3604(f), the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and Utah landlord-tenant statutes. This included explicit denial of reasonable accommodations requested to mitigate Plaintiff's medically documented disabilities. Defendant Jillian Penman refused these accommodations in a dismissive, degrading, and hostile manner, causing Plaintiff severe humiliation and emotional harm. Courts have recognized intentional retaliation against tenants who assert their rights as sufficiently outrageous to constitute IIED. See *Giebeler v. M&B Associates*, 343 F.3d 1143, 1154 (9th Cir. 2003) (landlord retaliation in response to accommodation requests can constitute outrageous conduct causing severe emotional distress).

C.    **Pattern of Harassment and Intimidation:** Defendants systematically engaged in harassment and intimidation of Plaintiff in an ongoing campaign designed to force Plaintiff out of the residence. This included issuing multiple improper eviction notices, fabricating lease violations without factual basis, ignoring Plaintiff's legitimate habitability concerns, intentionally misrepresenting facts (such as falsely claiming noise complaints were unfounded or the upstairs unit was vacant), and repeatedly pressuring Plaintiff to vacate the premises. The rapid escalation from Plaintiff's formal written criticism of Defendants' management practices on March 3, 2025, to the issuance of a retaliatory eviction notice on March 7, 2025, confirms the intentional and vindictive nature of Defendants' harassment. Such repeated and intentional acts clearly cross the threshold of acceptable conduct in civilized society and have been recognized as outrageous under Utah law. See *Cabaness v. Thomas*, 232 P.3d 486, 500 (Utah 2010) (holding repeated harassment and intimidation sufficient for IIED claim).

D.    **Intentional Use of an Improper Notice to Vacate to Force Plaintiff's Eviction:** Defendants knowingly bypassed legal eviction procedures by issuing a three-day notice to vacate instead of the required notice to comply or vacate, exploiting Plaintiff's presumed ignorance of the law to unlawfully accelerate the eviction.

i.    Utah law treats operating a business from a rental as a curable violation, requiring a notice to comply or vacate before eviction. See Utah Code § 78B-6-802(1)(d).

ii.    On March 7, 2025, defendants issued a three-day notice to vacate instead, unlawfully skipping the required opportunity to cure via a Notice to Comply or Vacate.

iii.    In a March 8, 2025 email, Jillian Penman admitted no separate notice was given, falsely claiming the lease itself served as notice, contradicting Utah law.

iv.    Defendants used the improper notice as a tool to force an expedited eviction, leveraging

fear and legal uncertainty rather than following due process.

v.      This deliberate misuse of eviction procedures caused Plaintiff unnecessary distress and financial hardship, constituting extreme and outrageous conduct.

E.      **Egregious Denial of FHA Accommodation Request and Coercive Conduct:**

Defendants' response to Plaintiff's FHA accommodation request was not only a refusal to engage in the interactive process but was also issued in a dismissive and coercive manner, exacerbating Plaintiff's emotional distress. Specifically:

i.      On March 7, 2025, Plaintiff formally requested a 45-day extension of the eviction deadline as a reasonable accommodation under the FHA due to disability-related hardship. This request was based on federal case law and HUD guidelines, which explicitly recognize eviction extensions as valid accommodations.

ii.     On March 8, 2025, Jillian Penman responded by outright denying the request, falsely claiming that reasonable accommodations cannot alter eviction deadlines despite clear legal precedent stating otherwise.

iii.    Rather than engaging in a meaningful discussion about the request or considering alternative accommodations, defendants conditioned any extension on Plaintiff signing a settlement agreement admitting to lease violations. This coercive tactic—forcing a tenant to concede wrongdoing in exchange for an accommodation—violates fundamental FHA principles and is an improper abuse of power.

iv.     Defendants further insisted that no prior notice of alleged lease violations was required because Plaintiff had previously signed a lease, disregarding the clear legal requirement that a notice to comply or vacate must be issued before eviction.

v.      This response was not only legally improper but was designed to inflict emotional

distress by denying a legitimate disability-related request, leveraging eviction as a weapon, and conditioning relief on a forced admission of guilt. The refusal to comply with FHA obligations in such an egregious and punitive manner constitutes outrageous conduct that exceeds the bounds tolerated by civilized society, meeting the standard for intentional infliction of emotional distress.

134.    **Damages: Extreme and Outrageous Conduct Caused Severe Emotional Distress:** As a direct result of Defendants' intentional and reckless conduct, Plaintiff suffered profound and ongoing emotional distress, significantly impairing his mental and physical well-being. The emotional harm suffered by Plaintiff includes, but is not limited to, anxiety, severe depression, insomnia, impaired daily functioning, panic attacks, exacerbation of existing medical conditions, loss of enjoyment of life, and profound worry for the stability and security of his family, including minor children. This severe emotional harm is objectively demonstrable, surpasses ordinary distress, and aligns with standards Utah courts recognize as actionable harm under IIED claims. See *Prince v. Bear River Mut. Ins. Co.*, 56 P.3d at 536 (emotional distress must be significant enough that no reasonable person should be expected to endure it).

135.    Defendants knew or should have known their outrageous actions would cause Plaintiff severe emotional distress, given the context, the personal nature of their retaliatory actions, and Plaintiff's documented mental health condition. Their reckless disregard for Plaintiff's emotional and physical well-being further demonstrates the egregiousness of their conduct.

136.    **Relief Requested:** Due to Defendants' intentional infliction of emotional distress, Plaintiff seeks damages including, but not limited to:

A.    Compensation for severe emotional suffering, anxiety, humiliation, and mental anguish.

B.    Compensation for physical symptoms resulting directly from Defendants' outrageous and

intentional conduct.

C.      Reimbursement for any related medical or therapeutic treatment costs.

D.      Punitive damages to deter Defendants from future misconduct and retaliatory behavior, justified by Defendants' intentional malice and reckless disregard for Plaintiff's emotional and physical well-being.

E.      Attorney's fees and litigation costs as may be permitted by law.

f.      Any additional equitable relief this Court deems just and appropriate under the circumstances.

## COUNT XII – WRONGFUL EVICTION IN VIOLATION OF UTAH CODE § 78B-6-802

(Utah Statutory Claim - Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367)

137.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

138.    This Court has supplemental jurisdiction over this state-law claim pursuant to 28 U.S.C. § 1367 because it arises from the same nucleus of operative facts as Plaintiff's federal claims under the FHA, ADA, and § 1983.

139.    Utah Code § 78B-6-802 requires landlords to follow specific statutory procedures before initiating eviction proceedings, including providing tenants with a Notice to Comply or Vacate for curable lease violations. The law mandates that tenants be given an opportunity to remedy an alleged violation before eviction proceedings can proceed.

140.    Defendants violated Utah Code § 78B-6-802 by issuing a Three-Day Notice to Vacate on March 7, 2025, instead of the required Notice to Comply or Vacate.

141.    The eviction notice falsely alleged that Plaintiff was operating an unauthorized business from the residence and included a violation of animal rules. However:

A.      Defendants provided no prior notice, warning, or opportunity to cure before escalating to eviction.

B.      Operating a business from a residential unit is a curable lease violation under Utah law. Utah Code § 78B-6-802(1)(d) requires that tenants be given written notice and an opportunity to remedy the alleged violation before eviction.

C.      In an email dated March 8, 2025, Defendant Jillian Penman admitted that no formal Notice to Comply or Vacate had been issued, instead asserting that the lease agreement itself served as sufficient notice. This is legally incorrect. Courts have repeatedly held that a lease agreement does not satisfy statutory notice requirements. See Housing Authority of County of Salt Lake v. Delgado, 914 P.2d 1163, 1165 (Utah Ct. App. 1996).

D.      Defendants also included an alleged violation of animal rules in the eviction notice despite Plaintiff informing them in writing on March 1, 2025, that the baby hamster had already been removed from the unit. Defendants made no effort to verify the validity of this claim before issuing the notice, further demonstrating their intent to remove Plaintiff under false pretenses rather than for legitimate lease enforcement.

142.    Defendants' failure to issue the required Notice to Comply or Vacate rendered the eviction legally invalid under Utah law. See Golden Forest Holdings, LLC v. Noyes, 2017 UT App 150, ¶ 16 (holding that lease violations requiring notice to cure cannot be the basis for immediate eviction without compliance with Utah Code § 78B-6-802).

143.    Defendants' wrongful eviction attempt was retaliatory and followed Plaintiff's exercise of legal rights, including:

A.      Filing habitability complaints regarding a defective water heater.

B.      Criticizing Defendant Jillian Penman in a written email on March 3, 2025, regarding her

dismissive response to Plaintiff's FHA reasonable accommodation request for noise disturbances affecting his ESA.

C.      Submitting a formal request for a disability-related eviction extension on March 7, 2025, which Defendants denied without engaging in the legally required interactive process.

144.    Defendants misused Utah's eviction process as a tool for retaliation rather than as a lawful means of enforcing lease provisions, violating both Utah landlord-tenant law and federal fair housing protections.

145.    **Damages:** As a direct and proximate result of Defendants' wrongful eviction attempt, Plaintiff has suffered substantial harm, including but not limited to:

A.      Severe emotional distress and anxiety due to the immediate threat of eviction and housing instability.

B.      Financial damages from the need to seek alternative housing, legal representation, and relocation costs.

C.      Harm to Plaintiff's rental history and future housing opportunities, as an attempted eviction can negatively impact rental applications and credit standing.

D.      Exacerbation of Plaintiff's disability symptoms, including heightened anxiety and sleep deprivation due to Defendants' retaliatory and unlawful conduct.

146.    **Relief Requested:** Given Defendants' wrongful eviction and violation of Utah Code § 78B-6-802, Plaintiff is entitled to the following relief:

A.      Declaratory relief confirming that Defendants' eviction notice was unlawful and violated Utah law.

B.      Compensatory damages for financial losses, emotional distress, and harm to Plaintiff's housing stability.

C.      Punitive damages due to Defendants' intentional and retaliatory abuse of eviction procedures.

D.      Attorney's fees and litigation costs incurred as a result of Defendants' wrongful eviction attempt.

E.      Any other equitable or legal relief the Court deems just and appropriate under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, awarding the following relief:

1.      **Declaratory Relief:**

A.      A declaration that Defendants' actions violated the Fair Housing Act (42 U.S.C. § 3601 et seq.), the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.), Utah landlord-tenant law, and Plaintiff's contractual rights.

B.      A declaration that the Three-Day Notice to Vacate issued on March 7, 2025, was unlawful and in violation of Utah Code § 78B-6-802.

2.      **Injunctive Relief:**

A.      An order permanently enjoining Defendants from engaging in further acts of retaliation, discrimination, wrongful eviction, and failure to accommodate under the FHA and ADA.

B.      An order requiring Defendants to approve all lawfully submitted disability accommodation requests in compliance with federal and state laws.

C.      An order prohibiting Defendants from issuing any future notices or taking any adverse actions against Plaintiff in retaliation for asserting his rights under federal and state law.

3.      **Compensatory Damages:**

A.      General and special damages for financial losses incurred as a result of Defendants'

retaliatory eviction attempt, including but not limited to moving expenses, increased rent costs,

and legal fees.

B.      Compensation for damage to Plaintiff's rental history, including any impact on future

housing opportunities.

C.      Damages for Defendants' failure to maintain habitability, including prolonged denial of

essential repairs (e.g., water heater).

D.      Compensation for lost wages due to time spent responding to Defendants' unlawful

actions, attending legal proceedings, and dealing with housing instability.

4.      **Emotional Distress Damages:**

A.      Compensation for severe emotional distress, anxiety, and mental anguish resulting from

Defendants' retaliatory actions, wrongful eviction attempts, defamation, and failure to provide

reasonable accommodations.

B.      Damages for exacerbation of Plaintiff's disability symptoms due to Defendants' failure to

accommodate under the FHA and ADA.

5.      **Punitive Damages:**

A.      Punitive damages against Defendants for willful, malicious, and intentional violations of

Plaintiff's rights, in an amount sufficient to deter similar misconduct in the future.

B.      Enhanced damages due to Defendants' bad faith eviction tactics and wrongful use of

legal processes.

6.      **Attorney's Fees and Litigation Costs:**

A.      Reasonable attorney's fees and costs incurred in bringing this action pursuant to 42

U.S.C. § 3613(c)(2) (FHA), 42 U.S.C. § 12205 (ADA), 42 U.S.C. § 1988 (civil rights claims),

and any other applicable law.

7.    **Any other relief this Court deems just and proper.**

**Respectfully submitted,**


**Dated:** March 9th 2025

**By:**
**/s/Christopher K. Andersen**
5024 W Frogs Leap Dr, 1203
South Jordan, Utah 84009
385-560-9945
Christopher.k.andersen@gmail.com
**Plaintiff, Pro Se**